UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                          :

BRUCE GOONAN,                      :

                 :     Civ. No.: 12-Civ-3859 (JPO) (AJP)

           Plaintiff,      :

                 :

    - against -            :

                 :

FEDERAL RESERVE BANK OF NEW YORK  :

                 :

          Defendant.     :

                 :
-------------------------------------------------------------X

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
## FEDERAL RESERVE BANK OF NEW YORK'S
## <u>MOTION FOR SUMMARY JUDGMENT</u>

Thomas C. Baxter, Jr.
General Counsel and
  Executive Vice President
Federal Reserve Bank of New York
33 Liberty Street
New York, NY  10045

*Of Counsel:*

Shari D. Leventhal

**TABLE OF CONTENTS**

                                                                            **Page**

TABLE OF AUTHORITIES ..................................................................................iii

PRELIMINARY STATEMENT .............................................................................1

STATEMENT OF FACTS ......................................................................................3

A.      PLAINTIFF'S JOB PERFORMANCE .....................................................3

        Plaintiff's Performance While Telecommuting........................................8

B.      PLAINTIFF'S REQUEST FOR ACCOMMODATION..........................9

C.      THE NEW YORK FED'S EFFORTS TO ACCOMMODATE
        PLAINTIFF..............................................................................................11

D.      PLAINTIFF WITHDRAWS FROM THE INTERACTIVE
        PROCESS AND DECIDES TO RETIRE ...............................................14

ARGUMENT ........................................................................................................16

I.      STANDARD OF REVIEW .....................................................................16

II.     PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE CLAIM FOR
        FAILURE TO ACCOMMODATE BECAUSE THE NEW YORK FED
        OFFERED REASONABLE ACCOMMODATIONS.................................16

III.    PLAINTIFF UNILATERALLY WITHDREW FROM THE
        INTERACTIVE PROCESS.......................................................................19

IV.     PLAINTIFF CANNOT ESTABLISH A DISCRIMINATORY ANIMUS ..............21

V.      PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE
        CLAIM FOR CONSTRUCTIVE DISCHARGE.......................................22

VI.     PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE CLAIM
        FOR RETALIATION ...............................................................................24

CONCLUSION......................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

Alston v. N.Y.C. Transit Auth., No. 02 Civ. 2400 (JGK),
 2003 WL 22871917 (S.D.N.Y. Dec. 3, 2003) ........................................................................ 24

Borkowski v. Valley Cent. School Dist., 63 F.3d 131 (2d Cir. 1995).......................................... 19

Bresloff-Henandez v. Horn, No. 05 Civ. 0384 (JGK),
 2007 WL 2789500 (S.D.N.Y. Sept. 25, 2007)...................................................................... 19

Celotex Corp. v. Catrett, 477 U.S. 317 (1986)............................................................................ 16

Donofrio v. N. Y. Times, No. 99-CV-1576 (RCC)(JCF),
 2001 WL 1663314 (S.D.N.Y. Aug. 24 2001) ...................................................................... 20

Exarhakis v. Visiting Nurse Serv. of N.Y., No. 02-CV-5562 (ILG),
 2006 WL 335420 (E.D.N.Y. Feb. 13, 2006) ........................................................................ 21

Frumusa v. Zweigle's, Inc., 688 F. Supp. 2d 176 (W.D.N.Y. 2010)............................................ 19

Gibbs v. Consol. Edison Co., 714 F. Supp. 85 (S.D.N.Y. 1989).................................................. 16

Gingold v. Bon Secours Charity Health Sys., 768 F. Supp. 2d. 537 (S.D.N.Y. 2011)........... 20, 21

Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14 (2d Cir. 1995) ........................... 16

Graves v. Finch Pruyn & Co., 457 F.3d 181 (2d Cir. 2006)........................................................ 17

Harper v. NYC Admin. for Children's Svcs., No. 09 Civ. 2468(JPO),
 2012 WL 3834087 (S.D.N.Y. Aug. 22, 2012)...................................................................... 16

Kemer v. Johnson, 900 F. Supp. 677 (S.D.N.Y. 1995)................................................................ 17

Kinneary v. City of New York, 601 F.3d 151 (2d Cir. 2010)....................................................... 22

Krikelis v. Vassar Coll., 581 F. Supp. 2d 476 (S.D.N.Y. 2008).................................................. 17

Lalla v. Consol. Edison Co. of N.Y., No. 00 CIV 6260 (HB),
 2001 WL 456248 (S.D.N.Y. April 30, 2001) ................................................................. 18, 25

Little v. New York, No. 96 CV 5132(SJ),
 1998 WL 306545 (E.D.N.Y. June 8, 1998).......................................................................... 25

Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208 (2d Cir. 2001)................................. 24

Martinez-Santiago v. Zurich N. Am. Ins. Co., No. 07 Civ. 8676(RJH),
    2010 WL 184450 (S.D.N.Y. Jan. 20, 2010)........................................................................... 24

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)........................................................... 16

Misek-Falkoff v. IBM Corp., 854 F.Supp. 215 (S.D.N.Y. 1994)................................................. 18

Murphy v. BeavEx, Inc., 544 F. Supp. 2d 139 (D. Conn. 2008)................................................... 23

Nugent v. St. Lukes-Roosevelt Hosp. Ctr., No. 05 Civ. 5109 (JCF),
    2007 WL 1149979 (S.D.N.Y. Apr. 18, 2007) ........................................................................ 20

Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100 (2d Cir. 2001) ............................................. 21

Petrosino v. Bell Atl., 385 F.3d 210 (2d Cir. 2004) ..................................................................... 23

Ragusa v. United Parcel Serv., No. 05 Civ. 6187 (WHP),
    2009 WL 637100 (S.D.N.Y. Mar. 3, 2000)............................................................................ 17

Reg'l Econ. Cmty. Action Program, Inc., v. City of Middletown,
    294 F.3d 35 (2d Cir. 2002)..................................................................................................... 16

Scott v. Harris, 550 U.S. 372 (2007)............................................................................................ 16

St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993) .................................................................. 16

Terry v. Ashcroft, 336 F.3d 128 (2d Cir. 2003)............................................................................ 23

Williams v. British Airways, PLC, No. 04-CV-0471 (CPS)(SMG),
    2007 WL 2907426 (E.D.N.Y. Sept. 27, 2007) ...................................................................... 20

Woroski v. Nashua Corp., 31 F.3d 105 (2d Cir. 1994) ................................................................ 16

## Statutes

12 U.S.C. § 221.............................................................................................................................. 3

42 U.S.C. § 12101........................................................................................................................... 1

42 U.S.C. § 12111(9)(B)............................................................................................................... 18

Administrative Code of the City of New York § 8-101................................................................... 1

N.Y. Exec. Law § 290..................................................................................................................... 1

## Rules

Fed. R. Civ. P. 56......................................................................................... 1, 16

## Regulations

29 C.F.R. § 1630.2(o)(3) ............................................................................. 19

Defendant Federal Reserve Bank of New York (the "New York Fed" or the "Bank") respectfully submits this memorandum of law in support of its motion for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, on the Amended Complaint ("Am. Compl.") filed by Plaintiff Bruce Goonan alleging discrimination and retaliation under the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 et seq. (the "ADA"); the New York State Human Rights Law, Executive Law §§ 290 et seq. (the "NYSHRL"); and the New York City Human Rights Law, Administrative Code of the City of New York §§ 8-101 et seq. (the "NYCHRL").

## PRELIMINARY STATEMENT

The material facts are not in dispute. Based on those facts—including numerous admissions by Plaintiff—the New York Fed is entitled to judgment as a matter of law.

Plaintiff claims that he is disabled because he suffers from post-traumatic stress disorder ("PTSD") as a result of working in lower Manhattan on September 11, 2001, and that his condition was aggravated when his group moved from 33 Maiden Lane to 3 World Financial Center in January 2010. He argues that the New York Fed discriminated and retaliated against him when it denied his request to telecommute full-time from home or to relocate full-time to the New York Fed's main building at 33 Liberty Street—away from his supervisors and team. Setting aside the fact that Plaintiff was diagnosed with PTSD in *August* 2001 for matters unrelated to the September 11 terrorist attacks, Plaintiff has failed to establish a *prima facie* claim for failure to accommodate his disability. The record demonstrates that the New York Fed offered Plaintiff multiple accommodations that are, on their face, reasonable. Some of the accommodations are expressly mentioned in the ADA itself, and all of the Banks' accommodations were designed to respond to the letters from Plaintiff's treating doctors, which at Plaintiff's request were deliberately "general" and "vague." Plaintiff also admits that his

supervisor raised the possibility of relocation out of Manhattan entirely to the Bank's offices in East Rutherford, New Jersey—which, Plaintiff concedes, would have been effective.

Although Plaintiff argues that his requested accommodations were reasonable, the record cannot support that claim. Plaintiff's well-documented and undisputed work history shows that he was perennially criticized for poor self-management, dependability, initiative, communication and work organization. In addition, Plaintiff's job necessarily involved collaboration with colleagues, which in light of his performance history would have been strained by working remotely from the rest of his team. Plaintiff, who telecommuted regularly on a part-time basis, admits that while telecommuting he failed to keep regular business hours and instead used his time to shovel snow, cook dinner, run errands, or visit White Castle. And, as a matter of law, just because Plaintiff proposed two accommodations does not render his employer's alternatives unreasonable. Indeed, several courts have concluded that full-time telecommuting is an extraordinary form of accommodation not ordinarily available under the ADA.

Moreover, the record is clear that Plaintiff unilaterally ended the interactive process by electing to retire instead of responding to the New York Fed's offers of accommodations. And even if the Bank were somehow at fault for the breakdown of the interactive process—which the record does not support—Plaintiff offers no evidence of a discriminatory animus. Although Plaintiff now argues that the Bank's accommodations were unreasonable because they required him to work in a place that made him suicidal, it is undisputed that neither Plaintiff nor his treating doctors told the New York Fed that he was suicidal at the time. Finally, judgment must be entered for the Bank on Plaintiff's claims for constructive discharge and retaliation because he cannot point to any record evidence demonstrating either an objectively intolerable work environment or any retaliatory conduct beyond denying his proposed accommodations.

## STATEMENT OF FACTS

### A.     PLAINTIFF'S JOB PERFORMANCE

Plaintiff was employed in the information technology group of the New York Fed[1] (now

called the Technology Services Group or "TSG") from February 1986 through his retirement on

August 1, 2011.  See Deposition of Bruce Goonan ("Goonan Dep.") at 25:16-26:12.[2]  Plaintiff

was hired as a systems hardware analyst, Salary Grade 13, promoted in 1989 to a senior systems

analyst, Salary Grade 14; and promoted in 1992 to a technical specialist, Salary Grade 15.

Goonan Dep. Exs. 32, 33, 36.  He received no promotions from 1992 until his retirement in

2011.[3]  As a technical specialist in the Application Development function of TSG, Plaintiff

worked on designing applications, primarily for the Bank's Statistics function.  See Deposition

of Irving Myones ("Myones Dep.") at 90:24-91:7 (Kalstein Aff. Ex. C).  Plaintiff was

responsible for designing, building and integrating systems, and was expected to interact with his

team and mentor teammates.[4]  See Deposition of Jean Bolwell ("Bolwell Dep.") at 117:20-

118:13 (Kalstein Aff. Ex. D) (Plaintiff's job was "highly collaborative" and he was expected to

interact with his coworkers "day in and day out"); Deposition of Julie Sun-Jannes ("Sun-Jannes

Dep.") (Kalstein Aff. Ex. E) at 364:18-366:13 (project required face to face interaction for

---

[1] The New York Fed is one of twelve Federal Reserve Banks chartered pursuant to the Federal Reserve Act of 1913, 12 U.S.C. §§ 221 et seq.  Congress created the Federal Reserve to serve as the central bank of the United States. The New York Fed and the other eleven Federal Reserve Banks serve as the operational arm of the nation's central bank.  The New York Fed has four offices, three in lower Manhattan (the Main Building at 33 Liberty Street, 33 Maiden Lane (also called 2 Federal Reserve Plaza), and 3 World Financial Center ("3 WFC")), and one in East Rutherford, New Jersey ("EROC").  See Goonan Dep. at 40:21-41:19; 96:21-24; 125:5-15.

[2] Excerpts of the deposition transcript and cited exhibits are attached as Exhibit A to the accompanying Affirmation of Michele Kalstein dated December 2, 2013 ("Kalstein Aff.").

[3] Plaintiff announced his decision to retire on May 24, 2011.  Deposition of Harry Zimbalist ("Zimbalist Dep.") Ex. 6 (Kalstein Aff. Ex. B).  His last day working in the office was June 1, 2011, and, after he was paid out for unused vacation, his retirement became effective as of August 1, 2011.  See Goonan Dep. Ex. 31.

[4] From 2001 through his retirement, Plaintiff's immediate supervisor was Julie Sun-Jannes.  Id. at 100:23-101:7. From 2009 through 2011, Ms. Sun-Jannes reported to Assistant Vice President Irving Myones, Myones Dep. at 19:22-21:4, who reported to Vice President Harry Zimbalist, id. at 10:14-22, 21:9-11.  Mr. Zimbalist reported to Jean Bolwell, Senior Vice President in charge of the Application Development function.  Zimbalist Dep. at 101:17-103:7.

effective collaboration and exchange of ideas); Deposition of William Christie ("Christie Dep.") Ex. 6 (key characteristics for Plaintiff's job included the ability to manage multiple complex projects independently and mentor colleagues) (Kalstein Aff. Ex. F); Zimbalist Dep. at 69:24-25 and 92:17-93:22.

Over the course of his 25 years at the Bank, Plaintiff received 15 performance appraisals. He was consistently given poor ratings in self-management, dependability, initiative, communication, and work organization.[5]  Plaintiff admitted that he often received criticism for weaknesses in these areas.  Goonan Dep. at 226:23-50:22 and Exs. 32-37, and 42-45.

Plaintiff's time-management skills were criticized in his first appraisal in 1987, id. at 226:23-229:25 and Ex. 32 ("Although Mr. Goonan has worked on a substantial amount of projects, he could, with better time-management, have completed them sooner."); his next appraisal in 1989, id. at 230:1-32:15 and Ex. 33 ("Although Mr. Goonan has shown considerable improvement in meeting deadlines during the appraisal period . . . he still requires improved performance in those areas cited previously, including greater adherence to specified deadlines and his ability to set priorities appropriately"); his appraisal in 1992, id. at 238:15-40:16 and Ex. 36 (noting Plaintiff's "difficulty meeting his deadlines" and his need of "excessive monitoring by his project director for timeliness"); and his appraisal in 1995, id. at 242:24-44:13 and Ex. 37 ("The most important areas where Bruce's performance could be enhanced are organizational and follow-up skills.  He also needs to be more conscientious about meeting deadlines.").

Plaintiff's 1990 appraisal rated him in the lowest category for dependability, noting that:

Mr. Goonan continues to experience problems completing his assignments on time

---

[5] The format of the performance appraisals changed over time.  In the early years there were three possible grades, essentially Above Standards, Meets Standards, and Below Standards.  That changed in 1995 with the addition of Far Above Standards and Far Below Standards.  In 2003, there were still five grades, but employees were now ranked 6-10 in each category.  In 2007, the grades became 1-5.  Employees received appraisals on different dates until 2010, when the Bank moved to the TPMS system and appraisals were delivered annually in December.  Goonan Dep. Exs. 32-46.

> and requires significantly more supervision than would normally be expected of
> someone with his level of experience.  In addition, he does not keep his supervisor
> appropriately informed and often neglects to handle important details. . . . Overall
> Mr. Goonan's erratic performance in the areas of dependability, initiative, and work
> organization interferes with his professional development and advancement.

Id. at 232:16-36:19 and Ex. 34.

Beginning in the year 2000, Plaintiff's supervisors began noting that, in addition to his

other performance issues, Plaintiff's skills were not keeping pace with changes in technology.

Plaintiff's technical expertise was in the area of mainframe applications, but as technology

evolved the Bank's applications were becoming web-based, and by 2009 and 2010, the Bank was

moving off a mainframe entirely.  Id. at 29:22-30:17.  For example, in 2003, Ms. Sun-Jannes,

noted that Plaintiff:

> needs to consistently demonstrate his responsibility and reliability by completing his
> assignments on time.  During the 2003 TIC series break project, several of his
> assignments were reassigned to other team members because of missed deadlines . . . .
> Furthermore, Bruce needs to become proficient in Web-based technologies so he can
> assume some of the support responsibilities for other Statistics applications.

Id. at 244:15-46:19 and Ex. 42.   In this appraisal, Plaintiff received the lowest possible rating for

planning and organizational skills and self-management.  Id. at 246:4-19 and Ex. 42.  The

following year, Ms. Sun-Jannes again noted that "[Plaintiff] needs to become more proficient in

Web-based technologies."  Id. at 246:21-47:11 and Ex. 43.  Plaintiff was rated a 7 (on a scale of

6-10, with 10 being the highest) in planning and organizational skills, innovation, self-

management/dependability, initiative, and work under pressure.  Id. and Ex. 43.  In Plaintiff's

2007 appraisal, Ms. Sun-Jannes rated Plaintiff "Below Standards" in "Initiative/Follow Through"

and "Communication and Information Sharing."  Id. at 247:17-49:3 and Ex. 44 (noting that

"[Bruce] needs to strive to be a more consistent player and deliver a high quality product in the

requested project timeframe.").

In his April 2009 appraisal, which covered the period from November 2007 through

March 2009, Plaintiff was again rated "Below Standards" in the areas of self-management, work

under pressure, oral communication and information sharing.  Id. at 249:4-50:22 and Ex. 45.[6]

Ms. Sun-Jannes noted that "[Bruce] needs to improve the quality of his products and timeliness

of delivery.  In addition, Bruce should be proactive in keeping his supervisor informed of delays

in completing his assignments."

      In his performance appraisal dated December 20, 2010, which covered the period from

April 2009 through December 2010, Plaintiff's overall rating dropped from a "3" or "Meets

Standards" to a "4" or "Below Standards."  Id. at 331:8-332:2.  Consistent with his earlier

appraisals, Plaintiff was rated "Below Standards" in a number of specific categories, including:

Project Leader/Implementation; Expertise/Knowledge; Communication Skills; Work

Organization; Self-management; and Customer Focus.  Plaintiff was again criticized for a lack of

communication with supervisors regarding the status of his projects, and an inability to work

independently—criticisms he acknowledges were "accurate."  Id. at 251:16-52:4 and Ex. 46.  In

fact, with two minor exceptions in 2007, Plaintiff admitted that *every one* of these appraisals

over the last 20 years was accurate.  Id. at 227:18-52:4.

      Plaintiff claims that his 2010 performance appraisal was a downward departure from

previous appraisals.  The undisputed evidence, however, demonstrates that while the TSG's

culture had been more lenient with respect to overall performance ratings in the past, there was a

---

[6] Plaintiff acknowledges that Ms. Sun-Jannes regularly expressed her concern to him that his communication skills
did not meet expectations and that he had to communicate more with her about what he was doing. Goonan Dep. at
100:23-102:20.  From 2001 through 2011, Ms. Sun-Jannes also noted Plaintiff's poor performance in the areas of
timeliness and meeting deadlines.  Id. at 102:21-103:9.  She expressed these concerns both in Plaintiff's
performance appraisals and in other feedback to Plaintiff.  For example, in April 2006, Plaintiff documented in his
handwritten notes that Ms. Sun-Jannes complained to him that "[y]ou take deadlines so lightly, you are back to this
again."  Id. at 106:6-18 and Ex. 9.  Plaintiff admits that Ms. Sun-Jannes was upset with him on a day that he was due
in the office between 8:30 and 9:00 a.m. because he overslept, woke up at 12:50 p.m. and did not call to tell her he
would be late until 1:15 p.m. (more than four hours after he was expected in the office).  Id. at 110:19-112:10 and
Ex. 9.  Plaintiff further admits that on another occasion in January 2010, he got up and walked out of a meeting with
Ms. Sun-Jannes while she was speaking.  Id. at 189:12-190:19.  Cf. Goonan Dep. at 180:1-183:6 and Ex. 20
(Plaintiff notes that "the feedback I got from a lot of people was that I pissed them off more than I led them.").

marked change after the Bank hired William Christie as the department leader in August 2008.

Plaintiff admits that Mr. Christie placed a greater focus on efficiency, accountability,

communication and sharp, up to date technology skills.  Id. at 34:21-37:20 and Ex. 2.  The

undisputed evidence demonstrates that Mr. Christie determined that the performance of TSG's

employees was not generally in line with expectations for the technology services industry as a

whole.  Christie Dep. at 174:20-175:13.  Mr. Christie set out to raise the bar and "raise

expectations" for employees within TSG, id. at 175:14-17, which would have the effect

beginning in late 2009 of "more staff members [receiving] below expectations this year in light

of the higher bar that's been set."  Id. at 228-229 and Day 2 Ex. 1.[7]

     As Mr. Myones testified, the bar was higher for 2010 annual reviews: "People were being

held much more accountable.  The leniency of the past were not – you were not supposed to be

as lenient in your rating."  Myones Dep. at 176:6-13.  Similarly, Ms. Sun-Jannes explained that

in connection with the 2010 annual reviews,

> there was a strong message coming down from senior management that the bar has
> been raised.  People have been—previously may have been treated as meeting
> standards with improvements because that is the way the bank's culture was to be
> nice, not to put a 4 labeling people as being below standards.

Sun-Jannes Dep. at 220:23-223:25.  This higher standard was reflected in the performance

appraisals for 2010, including Plaintiff's appraisal.  Plaintiff admits that the final performance

appraisal he received in late 2010, which covered the period from April 2009 (nine months

*before* the January 2010 move to 3 WFC) through December 2010, was "accurate" when it rated

his overall job performance as below standards.  Goonan Dep. at 251:16-52:4, 331:8-332:2.  As

would be expected given Mr. Christie's guidance to TSG managers, Plaintiff was not the only

---

[7] This was also true for the Bank on the whole.  As Leon Taub testified, "particularly ten and 15 years ago, the New York Fed was not as diligent as it is today in terminating poor performers for performance."  Deposition of Leon Taub ("Taub Dep.") at 74:15-18 (Kalstein Aff. Ex. G).  Taub noted that he himself had allowed three poor performers on his staff who were not meeting standards to remain until they were ready to retire.  Id. at 75:14-76:23.

TSG employee to receive a lower overall rating in 2010.  See Christie Dep. Day 2 Exs. 1 (2008 ratings), 2-3 (discussing new standards for rating performance in year-end 2009), 4 (responding to employee complaint in June 2010 that "recently performance appraisals were taken and all of my peers received below or far below expectations), and 6 (noting that the percentage of TSG employees rated a "4" (Below Standards) jumped from 5.9% in fall 2008 to 13% by the end of 2009 and that the same distribution was expected in 2010).

### **Plaintiff's Performance While Telecommuting**

Plaintiff began telecommuting from home one day a week in 2009, usually on Fridays. Goonan Dep. at 220:23-221:13.  Following a stress fracture that restricted his ability to walk, his management allowed him to telecommute full time for most of May and June 2010.  Goonan Dep. at 186:14-187:20.  Subsequently, Plaintiff was allowed to telecommute two days a week in order to accommodate his family's travel and vacation schedules.  However, at summer's end, Plaintiff's telecommuting schedule was reduced to one day a week due to continued performance concerns.  Sun-Jannes Dep. at 266:16-267: 9; Myones Dep. at 80:7-12.

The record demonstrates that Plaintiff was less responsive on the days he telecommuted, and was harder to reach when needed.  Plaintiff signed the Bank's telecommuting policy (Pl. 00639-00642, Kalstein Aff. Ex. H), which required him to be reachable by his management and coworkers during normal business hours, id. at 189:7-11; 221:10-13.  He admits, however, that while he was telecommuting, "I tend[ed] not to keep very close official hours. . . . Telecommuting from home sometimes started at 8:00 in the morning and sometimes run[sic] till late in the evening, with breaks for other things during the day."  Id. at 188:18-189:11; see also id. at 221:10-16 (Plaintiff's hours while telecommuting were "fairly loosely kept").  As noted in Plaintiff's calendar entries, while telecommuting, Plaintiff regularly scheduled breaks to

shovel snow, get dinner started, or go out for "White Castle breaks."  Id. at 220:15-21; FRBNY-

Goonan 002298, 002300, 002301, 002304, 002306, 002308, 002320 (Kalstein Aff. Ex. I).

Indeed, Ms. Sun-Jannes testified that Plaintiff never answered his phone on telecommuting days,

and that her calls went straight to voicemail.  Sun-Jannes Dep. 396:10-397:14.

## B.    PLAINTIFF'S REQUEST FOR ACCOMMODATION

Plaintiff claims that he developed PTSD as a result of working at the New York Fed at 33

Maiden Lane on September 11, 2001.  Am. Compl. ¶ 15.  Yet Plaintiff admits that he was

diagnosed with PTSD at least as early as *August* 2001 related to a fall 1982 automobile accident

which resulted in the death of his first wife "and its effects on me, and my ability to perform my

work."  Goonan Dep. at 55:20-58:14.  Plaintiff also claims that his group's move to 3WFC in

January 2010 exacerbated his PTSD, Am. Compl. ¶ 19, and belatedly asserts he was suicidal

continuously from October 2010 through June or possibly August 2011, Goonan Dep. at 115:16-

24.  Yet he waited until March 2011 to request a workplace accommodation—a full 14 months

after his group relocated to 3 WFC and five months after he allegedly became suicidal.[8]

On March 8, 2011, Plaintiff informed Ms. Sun-Jannes that he did not feel well.  Sun-

Jannes Dep. at 280:4-12.  Ms. Sun-Jannes immediately directed Plaintiff to the New York Fed's

Medical Services Division ("Medical Services").  Sun-Jannes Dep. at 270:9-17; see also Am.

Compl. ¶ 30.  Plaintiff told Medical Services that day that "the move to 3 WFC has had a very

bad effect on me," and that he had requested permission to telecommute full time from home.

Deposition of Dr. Gerald Stagg ("Stagg Dep.") (Kalstein Aff. Ex. J) at 77:17-78:25 and Ex. 2.

---

[8] Dr. Masliah, Plaintiff's treating psychiatrist, testified that Plaintiff was not suicidal after November 2010. See Deposition of Michele Masliah ("Masliah Dep.") at 98:21-99:15 (Kalstein Aff. Ex. L).  Plaintiff's contemporaneous medical records support this conclusion.  See Goonan Exs. 25 at Pl. 05401 (noting, on a September 2010 hospital admission form, only one factor placing Plaintiff at increased risk for suicide—that he was male) and 26 at 05465 (noting that, as of September 2010, Plaintiff had suicidal "ideation with no intent"); see also Goonan Dep. at 199:6-201:4 (confirming same for October 2010).

Medical Services instructed Plaintiff to get letter(s) from his treatment provider(s) indicating his diagnosis, how his work environment was impacting his condition and his ability to perform the essential functions of his job, any recommended modifications, and the duration that any modifications would be necessary.  Id.  In response, Plaintiff instructed his treating doctors to write letters that were "general" and "vague":

> I did not want—I could have told them, say, I have to move to the main building. But then if they decided the main building wasn't valid, then they wouldn't be able to comply with the letters.  So I told them to write the letter in a very general fashion so that the bank had leeway to decide whether the main building or working from home or putting me somewhere else would make sense.  So the letters are vague because I asked them to be vague because I wanted to be reasonable with this whole process.  And no one ever discussed with me what that meant or with my doctors what that meant so it—it's—the vagueness is my fault.

Goonan Dep. at 131:9-25.

On March 22, 2011, Plaintiff met with a nurse practitioner from Medical Services, Lois Hitchcock, and, for the first time, informed the New York Fed that he was suffering from PTSD. Am. Compl. ¶ 24; Deposition of Lois Hitchcock at 78:16-79:19 and Ex. 4 ("Hitchcock Dep.") (Kalstein Aff. Ex. K).  Plaintiff requested that, as an accommodation for his PTSD, he be allowed to telecommute full-time from home or, in the alternative, work full time from the New York Fed's Main Building at 33 Liberty Street.  Goonan Dep. at 84-85; Am. Compl. ¶ 30.

Plaintiff provided Medical Services with the letters from Dr. Masliah and Dr. Cohen, Plaintiff's two treating doctors.  Dr. Masliah's letter indicated that when Plaintiff "sees the sight of the World Trade Center, he becomes anxious and depressed."  Masliah Dep.at 104:8-25 and Ex. 3.  Dr. Masliah suggested that "[i]t would be advisable that Mr. Goonan's work environment be changed so that he can work to his full capacity."  Id. Ex. 3.  Dr. Cohen's letter recommended the relocation of "his physical work site" to "an office more removed from the site of the towers."  Deposition of Ilene Cohen at 280:12-23 and Ex. 2 ("Cohen Dep.") (Kalstein Aff. Ex.

M).  Nothing in either doctor's letter specifically stated that Plaintiff could not work anywhere in the 3 WFC building.[9]

## C.      THE NEW YORK FED'S EFFORTS TO ACCOMMODATE PLAINTIFF

Representatives from Medical Services, Legal, HR and Plaintiff's management worked together to respond to Plaintiff's accommodation request.  See Bolwell Dep. at 114:12-18. Based on Plaintiff's performance history, including his performance while telecommuting, Plaintiff's supervisors agreed that he needed to work in a supervised, team environment in order to function adequately.  Id. at 102:14-03:19.  Telecommuting full time from home or working full time from the Main Building, away from his team, would make it impossible for Plaintiff's supervisors to manage his work efficiently and effectively.  Bolwell Dep. at 102:14-03:19; Zimbalist Dep. at 242:18-243:9; Myones Dep. at 232:21-234:12.  The only space available to Application Development in the Main Building was a small "hoteling space" designed for temporary usage by TSG employees.  As described by Ms. Bowell, that space consisted of one office and seven cubicles and was shared by over 200 people who worked in TSG; it was not equipped for permanent usage, and could not permanently house a team of Application Developers.  See Bolwell Dep. at 143:9-22; Zimbalist Dep. at 359:5-14.  Ms. Bolwell, who made the ultimate business determination not to grant Plaintiff's original accommodation requests, explained that

---

[9] During discovery, Plaintiff deviated from what his doctors wrote and from what he had previously told them.  For the first time, Plaintiff stated that it was not the "sight" of the World Trade Center area or Freedom Tower that aggravated his PTSD; rather, it was being within a self-described "Exclusion Zone."  Goonan Dep. at 75:12-76:14. Plaintiff defined the "Exclusion Zone" as ". . . bounded by Chambers Street on the north, just a little south of Chambers Street on the north.  It's – on the eastern side it's bounded by Broadway.  And on the south side, I guess it's Albany Street.  And then the west side is the – of course the Hudson River.  So this square, which as best I can figure out, is the height of the tower, is an area to stay out of."  Id. at 75:25-76:10.  Notably, Plaintiff admits that he visits lower Manhattan regularly and has no problem going to stores located mere feet from the "Exclusion Zone" to eat or buy comic books.  Id. at 219: 5-16.  Goonan never informed the New York Fed of the existence of this "Exclusion Zone" during the accommodations process and he never mentioned that term to Dr. Masliah or Dr. Cohen.  Masliah Dep. at 129:10-12; Cohen Dep. at 251:2-4.

My business, my responsibility is to look at the business perspective.  Can I get the job done?  Can I deliver if Bruce is working outside of supervision? . . . I would not have been able to deliver.  He would not have been able to deliver based on his past performance . . . .

Bolwell Dep. at 116:23-117:15.

In an effort to craft other acceptable alternative accommodations, Dr. Stagg testified that he focused on the visual and physical aspects of Plaintiff's condition because that is what Plaintiff's treatment providers had focused on: "One doctor said he should change his work environment, and the other doctor said the physical work site could be relocated to an office more removed from the site of the towers."  Dr. Stagg explained: "[That] could have meant another building.  It could have meant another floor.  It could have meant another side of the floor."  Id. at 182:2-12.  Dr. Stagg consulted the U.S. Department of Labor's recommendations for employees with PTSD and sought to match Plaintiff's symptoms with potential solutions. Stagg Dep. at 142-145.  Based on Dr. Stagg's research and on the letters provided by Plaintiff's treating doctors, the New York Fed offered seven alternative accommodations.[10]  Id. at 125:6-135:8 and Ex. 8.  Dr. Stagg testified that similar accommodations had previously been successful for another New York Fed employee working in the Main Building who suffered from stress after 9/11 and requested, but was denied, a transfer to EROC in New Jersey.  Id. at 58:22-63:16.

Plaintiff admits that in addition to the seven alternate accommodations, Ms. Sun-Jannes suggested another option, which he characterized as a "tentative request": a transfer to EROC. Goonan Dep. at 392:17.  On March 29, 2011 at 10:48 a.m., Ms. Sun-Jannes left Plaintiff a voicemail saying that she knew TSG was looking for extra space in EROC, and wondering

---

[10] They were:  (1) to relocate Plaintiff's cubicle to the other side of the floor, away from the view of  the WTC construction site; (2) to allow for use of a white noise machine; (3) to allow for use of headsets to play soothing music; (4) the use of multi-spectrum light for work space; (5) to divide larger assignments into smaller tasks or steps; (6) to schedule weekly meetings with supervisors to see if deadlines were being met; and (7) to provide assignments in writing via email.  Id.

whether that might meet his requirements.  Goonan Dep. Ex. 10.  At the time, there were space

constraints at 3WFC, and management was considering moving teams to EROC.  Myones Dep.

at 24:2-19.  A team move would have allowed management to closely supervise Plaintiff.[11]

Less than a half hour after receiving this voicemail, Plaintiff forwarded it to his two

personal email accounts as "documentation" because he considered the voicemail

"important."  Id. at 133:16-135:2, 138:21-25 and Ex. 10.  Later that day, as he memorialized in

his personal day planner, Ms. Sun-Jannes told him that "maybe EROC would be a way from here

which addresses my issue."  Id. at 139:2-140:10 and Ex. 11.  Plaintiff played the voicemail for

his wife because he considered it "important."  Id. at 391:23-393:6.

Plaintiff admits that a move to EROC would have "addressed the issues" he was

raising.  Id. at 126:8-9.  Though he disputes whether a move to EROC was officially offered, he

further admits that a move to EROC "would have been an effective accommodation" and that he

would have accepted relocation to EROC despite a longer commute.  Id. at 129:22-130:7;

258:16-21.  Plaintiff concedes, however, that he failed ever to explore this option with his

management:

> A.   Did I realize—did I realize that EROC would be an effective
>      accommodation which addressed my issues?
> Q.   Yes.
> A.   Yes.
> Q.   And yet following April 20, 2011, you never went back to any member of
>      your management or anyone at the Federal Reserve Bank of New York to
>      discuss a possible more to EROC; is that correct?
> A.   *After April 20, I never went back to anyone, that's correct.*

Id. at 157:11-158:9 (emphasis added).  Instead, Plaintiff elected to retire and to terminate

---

[11] Ultimately, no Application Development teams were relocated to EROC.  It is undisputed, however, that had Mr. Goonan expressed an interest in moving to EROC at that time, Mr. Myones would have considered this request and would have passed it on to senior management.  Myones Dep. at 293:7-295:21.  Mr. Zimbalist indicated that if Mr. Goonan had indicated that a move to EROC would be an effective accommodation, he would have considered it, so long as he was moved with a supervisor.  Zimbalist Dep. at 358:5-24.

unilaterally the interactive process, leaving this potentially viable option wholly unexplored.

**D.      PLAINTIFF WITHDRAWS FROM THE INTERACTIVE PROCESS AND DECIDES TO RETIRE**

On April 19, 2011, after Ms. Sun-Jannes followed up with Plaintiff regarding his

accommodation request, Plaintiff wrote in his personal day planner:

> Julie asks if I have heard anything.  Tell her not yet but Dr. Stagg is going to meet with me and that I am hopeful for a good outcome.  Julie told me it is important to keep up with my work performance and that telecommuting is a privilege-if my performance improves and is consistent management can do more for me.  But I need to be at least a 3.  *Btw, no matter what Dr. Stagg tells me, I should not take it as the be all and end all and that some things might still be worked out*."

Goonan Dep. at 145:14-47:14, 157:24-58:9 and Ex. 12 (emphasis added).  The very next day,

Mr. Zimbalist met with Plaintiff to present the seven alternative accommodations proposed by

the Bank.  Unbeknownst to Mr. Zimbalist, Plaintiff secretly recorded this conversation.

Zimbalist Dep. at 355:7-56:3; Goonan Dep. at 413:2-13 and Ex. 50.  As the recording shows,

Plaintiff listened to the suggested accommodations and calmly replied that he would review the

accommodations with his doctors and would get back to Mr. Zimbalist.  Plaintiff never

mentioned anything about being suicidal during this meeting.  Id.  Though he reviewed the

accommodations with Dr. Cohen, Plaintiff never responded to Mr. Zimbalist until after he had

announced his retirement.  Goonan Dep. at 150:4-151:3.

On May 10, 2011, without having responded to Medical Services, Mr. Zimbalist, or any

of his supervisors, Plaintiff (who had already retained counsel) contacted the New York Fed's

Ombudsman, Leon Taub.  Id. at 120:14-123:5.  Plaintiff now asserts that he contacted Mr. Taub

to make sure management understood that he needed to be moved because he was suicidal.  Id. at

121:22-122:7.  Yet, he admits that he never actually told Mr. Taub that he was suicidal, and did

not discuss his medical condition with Mr. Taub.  Id. at 122:8-122:18.  On May 13, 2011, after

speaking Plaintiff's managers, Mr. Taub met with Plaintiff and explained that the decision to not

grant Plaintiff's requested accommodation was based on Plaintiff's poor performance not only in 2010, but for many years.  Taub Dep. at 61:19-63:8.  Mr. Taub suggested that if Goonan believed that he had requested and been refused a reasonable accommodation, he should contact the New York Fed's internal Equal Employment Opportunity ("EEO") office.  Id. at 102:8-22.  Mr. Taub noted that Plaintiff did not get upset, and said yes to just about everything.  Id. at 102:6-22, 132:15-19.

Plaintiff never contacted the EEO office.  Nor did he at any time discuss with Medical Services or his supervisors any of the alternative accommodations the New York Fed had offered.  Instead, on May 24, 2011, Plaintiff unilaterally withdrew from the accommodations process.  That day, at a luncheon for long service employees, Plaintiff announced his retirement first to his clients, and, only later, to his supervisors.  Id. at 211:12-212:12. [12]  He told Ms. Bolwell and Mr. Zimbalist that "he was retiring, and that he was very excited because he was going to teach.  He was going to do something he always wanted to do, which was to teach."  Bolwell Dep. at 110:3-7.

Plaintiff's colleagues held a farewell luncheon for him at Au Mandarin, a restaurant in 3WFC.  When Ms. Sun-Jannes told him where the luncheon was to be held, Plaintiff did not express difficulty being in the building or ask to go elsewhere.  Instead, as he concedes, he replied: "Sounds yummy."  Goonan Dep. at 213:14-216:2 and Ex. 30.

On June 1, 2011, during an exit interview with Human Resources, Plaintiff admitted that his decision to retire was motivated in part by his poor performance appraisal for 2010, and added that he was *not suicidal*.  Deposition of Chris Lee ("Lee Dep.") Ex. 6 (Kalstein Aff. Ex. N).  The same day, Dr. Stagg called Plaintiff and "asked me if I could make—if I could think of any other accommodation my management would find acceptable."  Goonan Dep. 158:10-23.

---

[12] Plaintiff concedes that he discussed applying for a medical leave of absence with his wife, but elected to retire instead.  Goonan Dep. at 407:2-08:10.

Though he was aware that a move to EROC would have been an effective accommodation, Plaintiff responded that unless he could be permanently reassigned to the Main Building or telecommute full time, that there were no other options he would explore.  Id. at 158:25-159:13.

## ARGUMENT

### I.    STANDARD OF REVIEW

Summary judgment is required where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323-25 (1986).  The "'mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.'"  Harper v. NYC Admin. for Children's Svcs., No. 09 Civ. 2468 (JPO), 2012 WL 3834087, at *2 (S.D.N.Y. Aug. 22, 2012) (Oetken, J.) (quoting Scott v. Harris, 550 U.S. 372, 380 (2007) (emphasis in original)). Conclusory statements, speculation, unsubstantiated allegations, or merely colorable evidence will not suffice.  See Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995); Woroski v. Nashua Corp., 31 F.3d 105, 109-10 (2d Cir. 1994).

### II.   PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE CLAIM FOR FAILURE TO ACCOMMODATE BECAUSE THE NEW YORK FED OFFERED REASONABLE ACCOMMODATIONS.

Plaintiff bears the burden of establishing a *prima facie* claim of unlawful discrimination in the form of a failure to accommodate a disability.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973); Reg'l Econ. Cmty. Action Program, Inc., v. City of Middletown, 294 F.3d 35, 48-49 (2d Cir. 2002).[13]  To meet that burden under the ADA, NYSHRL, or

---

[13] If a plaintiff can support each element of a *prima facie* claim, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the alleged discrimination.  The employer need not prove by a preponderance of the evidence that its actions were not discriminatory, but may simply present clear and specific reasons for the actions.  See Gibbs v. Consol. Edison Co., 714 F. Supp. 85, 89 (S.D.N.Y. 1989) (citations omitted).

NYCHRL, Plaintiff must point to specific, admissible evidence showing that: (1) he is a person with a disability under the meaning of each statute; (2) the New York Fed is covered by such statute and had notice of the disability;[14] (3) Plaintiff could perform the essential functions of his job, with or without reasonable accommodation; and (4) the New York Fed refused to offer a reasonable accommodation. See Graves v. Finch Pruyn & Co., 457 F.3d 181, 184 (2d Cir. 2006); see also id. at n.3 (applying same analysis to NYSHRL claim); Ragusa v. United Parcel Serv., No. 05 Civ. 6187 (WHP), 2009 WL 637100, at *1 (S.D.N.Y. Mar. 3, 2009) (applying same analysis to NYCHRL claim).

Even after extensive discovery, Plaintiff is unable to establish a *prima facie* claim because the record demonstrates that the Bank offered multiple, reasonable accommodations, which Plaintiff simply chose not to accept.  It is well-settled that an employer is not required to offer the specific accommodation requested by a plaintiff if other, reasonable accommodations are available.  See Krikelis v. Vassar Coll., 581 F. Supp.2d 476, 486-487 (S.D.N.Y. 2008), Kemer v. Johnson, 900 F. Supp. 677, 686 (S.D.N.Y. 1995) (holding that defendant was not required to make plaintiff's suggested accommodation since a reasonable accommodation had already been made.)  In the instant case, the Bank offered Plaintiff numerous accommodations consistent with the letters from Plaintiff's treating doctors removing Plaintiff from the sight of and sounds of the Freedom Tower, including relocation to a desk away from the view of the Freedom Tower and possible relocation to New Jersey.  According to Plaintiff's psychiatrist, some of the alternative accommodations proposed by the New York Fed could have

---

The employer will have sustained this burden of *production* by producing *any evidence* of non-discriminatory reasons, whether ultimately persuasive or not.  See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993).  Once the employer carries this burden, a plaintiff must then prove by a preponderance of admissible evidence that (1) the employer's explanation is false and (2) discrimination was the real reason for the adverse action.  Id.
[14] As explained in both the New York Fed's motion to dismiss and its motion for reconsideration of the Court's denial of such motion, the NYSHRL and NYCHRL are preempted with respect to the New York Fed, a federal instrumentality.  There is thus an additional basis for summary judgment on Plaintiff's state and city law claims.

helped Plaintiff, had he tried them.  Masliah Dep. at 113:19-116:16.  Moreover, the types of

accommodations proposed by Plaintiff mirror significantly the types of accommodations

expressly mentioned in the ADA, compare supra n.10 with 42 U.S.C. § 12111(9)(B) (listing,

among other reasonable forms of accommodation, "job restructuring" and the "acquisition or

modification of equipment or devices").

Yet, Plaintiff chose not even to *try* any of the proposed accommodations.  Instead,

Plaintiff insisted that the New York Fed provide the accommodations he requested:

telecommuting full-time from home or be reassignment to the New York Fed's Main Building.

Setting aside the propriety of Plaintiff's proposals—which, as explained below, would have

created an undue hardship in the Bank—the mere existence of alternatives does not render the

Bank's proposals *unreasonable*.  Indeed, the record in this case reflects that the accommodations

offered to Plaintiff were similar to those used successfully with another employee that suffered

stress after September 11, 2001.  See supra at 12.

By contrast, the accommodations that Plaintiff proposed were legally unreasonable

because they would have resulted in undue hardship to the Bank.  "[W]ork at home is an

extraordinary accommodation, and is warranted in only exceptional cases." Lalla v. Consol.

Edison Co. of N.Y., Inc., No. 00 CIV 6260 (HB), 2001 WL 456248, at *4 (S.D.N.Y. April 30,

2001).  See also Misek-Falkoff v. IBM Corp., 854 F. Supp. 215, 277 (S.D.N.Y. 1994)

(dismissing plaintiff's complaint and holding that an employer may require an employee's

presence at the workplace where interaction with others is essential to the tasks to be performed).

Plaintiff's request to telecommute full-time from home, away from his supervisors and his team,

would have been unfeasible in light of the admittedly "loose" schedule he had kept when

telecommuting part time—including budgeting time for personal errands, including trips to

White Castle—and Plaintiff's undisputed performance history of poor self-management, organizational skills, dependability, and communication with supervisors.  Working from the Main Building could not be accomplished without (a) relocating a supervisor and a team, and (b) finding additional office space in a crowded building to house that team.  See supra at 11.  In addition, Plaintiff's job functions included working collaboratively with his team, and, in light of Plaintiff's long performance history and the limits of available technology, Plaintiff could not perform his job functions adequately while working alone at an off-site location (whether from home or the hotel space in the Main Building).  See, e.g., Borkowski v. Valley Cent. Sch. Dist., 63 F.3d 131, 138 (2d Cir. 1995) (requested accommodation poses undue hardship where it prevents plaintiff from performing any of his essential job functions); Frumusa v. Zweigle's, Inc., 688 F. Supp. 2d 176, 190 (W.D.N.Y. 2010) (summary judgment granted where defendant provided evidence that it would be undue hardship to move plaintiff's work station to another floor because plaintiff could perform only some of her job duties remotely from that location).

## III.   PLAINTIFF UNILATERALLY WITHDREW FROM THE INTERACTIVE PROCESS.

Even if Plaintiff could establish a *prima facie* claim for failure to accommodate his disability, Plaintiff's claim is legally untenable because the undisputed evidence demonstrates that he unilaterally withdrew from the interactive process when he voluntarily resigned.  The interactive process is a fundamental aspect of the ADA, NYSHRL, and NYCHRL.  It requires employees and employers to work together in good faith in "an informal, interactive process . . . [which] should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."  29 C.F.R. § 1630.2(o)(3).  See also Bresloff-Henandez v. Horn, No. 05 Civ. 0384 (JGK), 2007 WL 2789500, at *9-10 (S.D.N.Y. Sept. 25, 2007) (using identical analysis to dismiss plaintiff's claims under

ADA, NYSHRL and NYCHRL where plaintiff failed to give definite notice of her disability that would have allowed employer to participate in interactive process).

"When determining whether an employer may be held liable for a breakdown in the interactive process, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. . . . In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility." Nugent v. St. Luke's Roosevelt Hosp. Ctr., No. 05 Civ. 5109 (JCF), 2007 WL 1149979, at *50-51 (S.D.N.Y. Apr. 18, 2007) (quotation marks omitted). Courts routinely hold that "where the employee causes the interactive process to collapse, the employer will not be liable." Williams v. British Airways, PLC, No. 04-CV-0471 (CPS)(SMG), 2007 WL 2907426, at *9 (E.D.N.Y. Sept. 27, 2007) (citations omitted). Thus, where an employee resigns or otherwise simply ceases to work towards an accommodation, courts have concluded that the employee was responsible for the breakdown in the interactive process and grant summary judgment in favor of employers. See, e.g., Gingold v. Bon Secours Charity Health Sys., 768 F. Supp. 2d 537, 544, 546 (S.D.N.Y. 2011) (granting summary judgment for defendant where employee unilaterally terminated reasonable accommodation process by resigning before employer could complete investigation of possible accommodations); Donofrio v. N.Y. Times, No. 99-CV-1576 (RCC)(JCF), 2001 WL 1663314, at *20 (S.D.N.Y. Aug. 24, 2001) ("Plaintiff himself caused the failure of the interactive process . . . [because he] was no longer working toward an accommodation of his disability, but was effectively seeking an indefinite leave of absence").

In the instant case, there is no basis in the record to dispute that Plaintiff terminated the interactive process. At no point did *anyone* from the New York Fed tell Plaintiff that the

interactive process was closed.  To the contrary, Ms. Sun-Jannes, Mr. Zimbalist and Dr. Stagg asked Plaintiff to talk to them if the proffered accommodations were not acceptable so that they could work to find other, acceptable accommodations.  See supra at 12-13 (Sun-Jannes), 14 (Zimbalist), and 15 (Stagg).  Plaintiff chose not to and retired instead.  Plaintiff even told Dr. Stagg that he would not consider *any* accommodation other than telecommuting or relocation to the Main Building, which precludes any consideration of a move to EROC.  See supra at 15-16. Indeed, the first time in the record that Plaintiff informed the New York Fed that the proposed accommodations did not meet his needs was in his e-mail announcing his retirement.  Stagg Dep. Ex. 8.  The law is clear an employer's obligation to engage in interactive process terminates upon employee's delivery of his resignation.  See Gingold, 768 F. Supp. 2d at 546.  The undisputed evidence shows that Plaintiff terminated the process and that summary judgment is thus required.

## IV.   PLAINTIFF CANNOT ESTABLISH A DISCRIMINATORY ANIMUS.

Even if Plaintiff could establish a *prima facie* claim, and even if the New York Fed were somehow responsible for the breakdown in the interactive process, Plaintiff still could not prevail on a failure to accommodate claim because the record is devoid of any competent and admissible evidence to show that the New York Fed's actions were pretextual or taken with a covert, discriminatory animus.  See supra n.13 (describing the burden-shifting standard).  See also Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 107-08 (2d Cir. 2001) (holding that, in a failure to accommodate claim, "the plaintiff's ultimate burden is always to show that the protected characteristic in question played a motivating role in, or contributed to, the employer's decision") (quotation marks omitted); Exarhakis v. Visiting Nurse Serv. of N.Y., No. 02-CV-5562 (ILG), 2006 WL 335420, at *10-12 (E.D.N.Y. Feb. 13, 2006) (summary judgment granted for employer where plaintiff failed to demonstrate discriminatory animus for ADA, NYSHRL, and NYCHRL claims).

21

Plaintiff alleges that he was suicidal as a result of September 11-induced PTSD, but the record establishes beyond cavil that Plaintiff in fact reported that he was *not suicidal* during his exit interview in June 2011.  See supra at 15.  Even Plaintiff's own doctor admits that he was not suicidal after November 2010—well before Plaintiff even requested an accommodation.  See supra n.8.  Nothing in this behavior suggests that the Bank even knew that Plaintiff was suicidal when he requested an accommodation, much less that it harbored a discriminatory animus toward Plaintiff on that basis.  In addition, after requesting an accommodation for PTSD in March 2011 (without any mention of suicide), the New York Fed responded by immediately directing him to Medical Services, conducting an interview, requesting documentation, proposing accommodations, and inviting a response from Plaintiff.  See supra at 9-13.[15]  Nor can Plaintiff's well-documented, consistent, and undisputed performance deficiencies evidence a discriminatory animus because Plaintiff's consistent shortcomings predate September 11 by more than a decade.  Indeed, he was not promoted since 1992.  See supra at 3.

## V.    PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE CLAIM FOR CONSTRUCTIVE DISCHARGE.

To the extent that Plaintiff is alleging a claim for unlawful discrimination in the form of constructive discharge, judgment must be entered for the Bank because the record demonstrates that Plaintiff resigned voluntarily and was not discharged, constructively or otherwise.  To establish a *prima facie* claim for discrimination, a plaintiff must demonstrate the first three elements of a failure to accommodate claim and, as a fourth element, that "plaintiff suffered an adverse employment action because of his disability."  Kinneary v. City of New York, 601 F.3d

---

[15] In sharp contrast to the Bank's good faith efforts to reach a mutually agreeable accommodation, Plaintiff admits that he secretly taped his boss, Mr. Zimbalist, when they met to discuss the Bank's response to Plaintiff's accommodation request.

151, 156 (2d Cir. 2010).  See also id. at 158 (acknowledging that the same elements apply under the NYSHRL and NYCHRL).  A plaintiff asserting constructive discharge as a form of adverse employment action must establish objectively that the employer's conduct was intentional and that working conditions had reached an intolerable level.  See Petrosino v. Bell Atl., 385 F.3d 210, 229 (2d Cir. 2004) (analyzing Title VII claim).  For working conditions to be legally intolerable, they must be "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign."  Terry v. Ashcroft, 336 F.3d 128, 148 (2d Cir. 2003) (quotation marks omitted).  Courts applying this standard have, understandably, set a high bar.  See, e.g., Murphy v. BeavEx, Inc., 544 F. Supp. 2d 139, 144-48 (D. Conn. 2008) (granting summary judgment and finding no constructive discharge where employee suffered from MS and was made fun of by co-workers, called nicknames for having bowel accidents, had a bad relationship with his supervisor, received unsatisfactory performance evaluations, and was denied a bonus).

In this case, the record demonstrates that Plaintiff informed his colleagues that he was retiring because (a) he wanted to teach and (b) he received a poor performance review, not because he found his work conditions intolerable or unbearable.  See supra at 15.  Retirement would not be at all surprising, given that Plaintiff had worked at the New York Fed for 25 years, had not been promoted since 1992, and, according to his annual reviews, which Plaintiff admits were accurate, was becoming increasingly out-of-step with web-based technology.  See supra at 3, 5, 6.  The record also belies—or at least casts serious doubt on—the assertion that Plaintiff's work location was objectively intolerable.  His first request for an accommodation as a result of September 11 trauma was made almost a decade after working in close proximity to Ground Zero and fourteen months after moving to the World Financial Center.  See supra at 9.

Moreover, in response to an invitation to a departure luncheon at a restaurant in 3 WFC, Plaintiff did not express difficulty or request a change in venue.  He replied, instead, "Sounds yummy."  See supra at 15.  These and other record evidence preclude any discrimination claim based on a theory of constructive discharge.

## VI.   PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE CLAIM FOR RETALIATION.

To establish a *prima facie* claim for retaliation under the ADA, NYSHRL, or NYCHRL, a plaintiff must show that: (1) he participated in a protected activity; (2) his employer was aware of the protected activity; (3) his employer took adverse employment action against him; and (4) there is a causal connection between the protected activity and the adverse employment action.  See Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 223 (2d Cir. 2001).  See also Alston v. N.Y.C. Transit Auth., No. 02 Civ. 2400 (JGK), 2003 WL 22871917, at *9 n.7 (S.D.N.Y. Dec. 3, 2003) (applying same retaliation analysis to ADA, NYSHRL, and NYCHRL).

Plaintiff is unable to establish the third and fourth elements of a retaliation claim because the record is devoid of any evidence that Plaintiff was subjected to adverse employment action. Plaintiff testified at his deposition that the *sole* basis for his claim of retaliation is the fact that the New York Fed did not grant his request to work full time from home or from the Main Building:

> Q.    How do you believe that the Federal Reserve Bank of New York retaliated against you?
> A.    By denying my accommodation.
> Q.    How did you feel that was retaliation?
> A.    Well, it put me in a position where I would either have to stay and kill myself or leave the bank and end my career.
> * * * *
> Q.    Is there any other way you believe the bank retaliated against you?
> A.    No.

Goonan Dep. at 85:13-86:10.

The law is clear that the denial of telecommuting status does not constitute an adverse

employment action.  See Martinez-Santiago v. Zurich N. Am. Ins. Co., No. 07 Civ. 8676(RJH), 2010 WL 184450, at *7 (S.D.N.Y. Jan. 20, 2010) (summarizing decisions of courts in this and other circuits that have consistently found that denial of work-from-home status does not constitute an adverse employment action); see also Lalla, 2001 WL 456248, at *4 (characterizing telecommuting as an "extraordinary accommodation").  Similarly, the fact that Plaintiff was not granted a transfer to the Main Building, his location of choice, does not constitute an adverse employment action as a matter of law.  See Little v. New York, No. 96 CV 5132(SJ), 1998 WL 306545, at *5-6 (E.D.N.Y. June 8, 1998) ("The realities of the workplace dictate that employees do not always have the option to work in the location they desire.").  Because Plaintiff's only alleged retaliation is the denial of his requested accommodation, which is not actionable, the New York Fed is entitled to judgment on the retaliation claim.

## CONCLUSION

For the foregoing reasons, the New York Fed respectfully requests that the Court grants its motion for summary judgment on the Amended Complaint in its entirety. [16]

Dated:  December 2, 2013
         New York, New York

                                        Respectfully submitted,

                                        By: /s/ Shari Leventhal
                                        Shari D. Leventhal
                                        Assistant General Counsel and
                                           Senior Vice President
                                        Federal Reserve Bank of New York
                                        33 Liberty Street
                                        New York, NY 10045
                                        (212) 720-5018

---

[16] Although he is able to work, Plaintiff admits that he has not looked for work.  His claims are thus subject to summary judgment for failure to mitigate damages.