UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                :

BRUCE GOONAN,                               :

                                 Plaintiff,   :          12-CV-3859 (JPO)
                 -v-                       :
                                                  :          OPINION AND ORDER
FEDERAL RESERVE BANK of NEW YORK,   :

                                Defendant.  :
                                                       :
------------------------------------------------------------X

J. PAUL OETKEN, District Judge:

       This case arises out of the end of Plaintiff Bruce Goonan's twenty-five year career with Defendant, The Federal Reserve Bank of New York ("the Fed"). Goonan, who suffers from Post-Traumatic Stress Disorder ("PTSD"), alleges that the Fed failed to provide him with reasonable workplace accommodations in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), the New York State Human Rights Law, Exec. Law § 290 *et seq.* ("NYSHRL"), and the Administrative Code of the City of New York, § 8–101 *et seq.* ("NYCHRL"). The Fed previously moved to dismiss the case for failure to state a claim and this Court denied the motion. (Dkt. No. 21.) The Fed now moves for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. It contends that any reasonable juror would find that it offered reasonable accommodations that Goonan refused, and that Goonan subsequently caused a breakdown in the parties' interactive process. For the reasons that follow, the motion for summary judgment is denied.

**I.      Background**[1]

     **A.      Goonan and the Fed**

Goonan worked for twenty-five years as an application developer in the Fed's information technology department, now called the Technology Services Group ("TSG"). His expertise lay in the design and development of mainframe computer applications for the Fed's high-volume securities trading work. Although he was occasionally rated "below standards" on his communication skills and self-management in Fed performance appraisals, Goonan maintained an overall "meets standards" rating in all annual appraisals with the exception of one made near the end of his career, during the disruptions that gave rise to this suit. From 2001 until the end of his career, his immediate supervisor was Julie Sun-Jannes. Because Goonan telecommuted on Fridays and Sun-Jannes telecommuted on Mondays, they met in person only about once a week. Most of their communication about Goonan's work was via phone or email.

Many of Goonan's job functions could be—and often were—performed remotely. Of the 80 to 90 people that Zimbalist supervised in application development, 50 to 60 telecommuted for at least part of their work week, including some who did not meet overall performance expectations. Some TSG employees telecommuted full-time, and Goonan himself had previously telecommuted full-time for a few weeks in May 2010 without any performance complaints.

---

[1] "On summary judgment the inferences to be drawn from the underlying facts. . . must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *see also Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004). That version of the facts follows, drawn largely from the parties' statements pursuant to Local Civil Rule 56.1. (*See* Dkt. No. 63 ("Def.'s 56.1"), Dkt. No. 64 ("Pl.'s 56.1").) Some facts or characterizations are drawn from the parties' memoranda on the motion for summary judgment. Where this is the case, it is noted.

B.      9/11 and the Move to Three World Financial Center

On September 11, 2001 ("9/11"), Goonan was in his office at 33 Maiden Lane, three blocks from the foot of the World Trade Center ("WTC"). He felt trapped and he feared for his life as the towers of the WTC burned and collapsed two blocks away from him. He sought out Fed-provided 9/11 counselling and employee assistance programs over the next several years, which improved his condition and allowed him to work at 33 Maiden without major issues.

In January 2010, the application development group of the TSG moved to an office on the 23rd floor of Three World Financial Center ("3 WFC"), which overlooks the site of the WTC. The Fed set aside "hoteling sites" for application developers at 33 Liberty Street (the "Main Building") and 33 Maiden Lane, which is across the street from the Main Building. The Fed installed new technology, including webcams and collaboration software, to facilitate collaboration among TSG employees across the three buildings. Shortly after Goonan left the Fed, some TSG employees returned to 33 Maiden Lane on a full-time basis to relieve overcrowding at 3 WFC.

The move to 3 WFC aggravated Goonan's pre-existing PTSD.[2] He became depressed and anxious and had nightmares involving being crushed and trapped. Goonan had to pass by the WTC on his way to work and he was acutely aware of its presence throughout the day. He was afraid that the new building would fall on him and kill him. On February 22, 2010, Goonan contacted the Fed's director of medical services, Dr. Stagg, to ask for a referral for specialist PTSD counseling. The Fed had no PTSD specialist to whom Goonan could be referred, so Dr.

---

[2] Goonan's PTSD appears to have begun after a 1982 car crash that killed his first wife. Goonan was injured in the crash and may have experienced some brain damage that led to a seizure disorder. Goonan continues to take Tegretol (Carbamazepine) to prevent seizures. According to Goonan's doctors, his PTSD was exacerbated by 9/11 and the move to 3 WFC.

3

Stagg referred him instead to the Employee Assistance Program ("EAP"). This was ineffective and, over the course of 2010, Goonan's work performance declined and his depression deepened.

By the fall of 2010, he was having vivid suicidal fantasies and flashbacks to 9/11. His work performance steeply declined and he received his first "below standards" overall performance review from Sun-Jannes. EAP referred him to a psychologist, Dr. Ilene Cohen, who evaluated him on October 25, 2010. She immediately diagnosed Goonan with PTSD and major depression and referred him to a psychiatrist, Dr. Michele Masliah. At his first meeting with Dr. Masliah on November 1, 2010, she prescribed Celexa (Citalopram), an antidepressant. Cohen believes that Goonan's experiences on 9/11 were "superimposed" on his pre-existing PTSD, which made his response to the attacks "quite severe." (Cohen Dep. 44:10-23.) She believed that Goonan's symptoms were not just about *seeing* the World Trade Center, but "had more to do with being in the building, in addition to how close he had to walk in order to get into the building." (Cohen Dep. 271:19-273:2; Masliah Dep. 87:21-25.)

      C.    **Goonan Requests Accommodation**

In March 2011, Goonan told Sun-Jannes about his difficulties and asked her for permission to work in the Main Building or, alternatively, to telecommute from home. She replied that Goonan would be able to telecommute only if his performance improved because telecommuting was a privilege. She directed Goonan to speak to Dr. Gerald Stagg, head of the Fed's medical department, to ask about possible accommodations. Goonan got in touch with Dr. Stagg, explained his request, forwarded letters from Drs. Cohen and Masliah, and was examined by Lois Hitchock, a nurse practitioner at the Fed's Medical Services department. Dr. Stagg understood the letters to mean that Goonan should be moved out of 3 WFC, and he further admitted at his deposition that he thought that Goonan's request to move was reasonable "from a medical standpoint." (Stagg Dep. 188:11-16.)

Zimbalist rejected Goonan's request for accommodations.  The internal process that led to this decision is disputed, but Zimbalist told Goonan on April 20, 2011 that the request was denied because Goonan was a poor performer who needed close supervision.  He offered instead seven alternative accommodations, drawn from a treatment plan that had been effective for another employee with 9/11-related PTSD:

> (1) to relocate Plaintiff's cubicle to the other side of the floor, away from the view of the WTC construction site; (2) to allow for the use of a white noise machine; (3) to allow for the use of headsets to play soothing music; (4) the use of multi-spectrum light for work space; (5) to divide larger assignments into smaller tasks or steps; (6) to schedule weekly meetings with supervisors to see if deadlines were being met; and (7) to provide assignments in writing via email.

(Stagg Dep. 125:6-135:8.)  Goonan felt that none of these proposals would address the core issue, which was his crippling fear that another attack would cause the new tower to fall on him.  He told Zimbalist at the April 20 meeting that he would consult with his doctors about the proposals.  Goonan told Zimbalist at the end of the meeting that he would follow up once he had recommendations from his doctors.  Dr. Cohen told Goonan that he thought that the accommodations would be ineffective and Dr. Masliah believed that they might even be harmful. (Masliah Dep. 116:17-117:9, 114:17-25, 115:5-116:16.)

**D.     The New Jersey Option**

Around the time that Goonan requested his accommodation, the Fed was independently considering moving the application developers to the Fed's office in East Rutherford, New Jersey ("EROC").  On March 29, 2011, Sun-Jannes left Goonan a voicemail message asking whether a move to EROC might meet his needs.  Goonan was not enthusiastic about the idea, and neither were his supervisors.  Indeed, it appears that no one at 3 WFC really wanted to go to EROC.  When Goonan spoke to Sun-Jannes about the proposal, he indicated that, if the Fed

wanted to move him to EROC, it would have to move a whole team as well so that the move would not appear to be retaliation for his accommodation request. Neither Goonan nor Fed management ever again raised the issue of a move to EROC.

### E. Endgame

Dissatisfied with the denial of his request for accommodation and with the proposed alternatives, Goonan went to the Fed ombudsman, Leon Taub. Goonan asked Taub to have Fed management reconsider its decision to deny his request to move out of 3 WFC. Taub proposed a compromise solution under which Goonan would be allowed to work from home or the Main Building for a trial period of one month. Fed management ultimately rejected this proposal as well. On May 13, 2011, after consulting with Goonan's supervisors, Taub told Goonan that his requests for accommodation were denied because he was a poor performer. He added that the Fed was not going to change its mind about the specific accommodations that Goonan had proposed. He encouraged Goonan to contact the internal Equal Employment Opportunity office if he felt he had unfairly been denied an accommodation for his PTSD.

All this left Goonan upset and led him to "spiral in crisis" over the course of May 2011. (Pl.'s Opp. at 6.) He spoke of killing himself, and believed he had to choose between suicide and ending his career. On May 24, 2011, he announced that he was going to retire because the alternatives that the Fed would consider would not help him resolve his problems. Zimbalist replied that he was "sorry to learn that the accommodations offered to [Goonan] to address [his] problem did not meet [his] needs." (Licul Dec. Ex. 17)

Goonan's final day in 3 WFC was June 1, 2011. On that day, Dr. Stagg called him a final time to ask whether any other accommodations might suit him. Goonan said no because, at that point, his mind was focused on leaving the building. After taking his unused vacation time, Goonan's retirement became effective on August 1, 2011.

## II. Discussion

### A. Summary Judgment Standard of Review

Courts grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are material "when they might affect the outcome of the suit under governing law," and disputes of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks and citations omitted). Put another way, summary judgment is appropriate "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for judgment." *Scott v. Harris,* 550 U.S. 372, 380 (2007).

When assessing the record to determine whether there is a genuine dispute of material fact, courts must view the record "in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (quoting *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 113 (2d Cir.2005)) (internal quotation marks omitted). At this stage, the Court makes no findings of fact and gives the non-moving party the benefit of whatever doubts may exist. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.")

### B. Discrimination under the ADA

#### 1. Legal Standard for Discrimination

The ADA prohibits discrimination against an otherwise qualified employee on the basis of her disability. In doing so, it requires employers to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the [its] business." 42 U.S.C. § 12112(b)(5)(A). When a plaintiff alleges that an employer has failed to make such an accommodation, "the plaintiff's burden requires a showing that (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *Graves v. Finch Pruyn & Co., Inc.,* 457 F.3d 181, 184 (2d Cir. 2006) (quoting *Rodal*, 369 F.3d at 118 (2d Cir. 2004)). "Unlike other enumerated constructions of 'discriminate,' this construction does not require that an employer's action be motivated by a discriminatory animus directed at the disability. Rather, any failure to provide reasonable accommodations for a disability is necessarily 'because of a disability.'" *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 264 (1st Cir. 1999) (internal citation omitted). Under this construction, "an employer who knows of a disability yet fails to make reasonable accommodations violates the statute, no matter what its intent, unless it can show that the proposed accommodations would create undue hardship for its business." *Id*.

A disabled employee's request for accommodation kicks off an informal and flexible "interactive process" meant to determine whether and how an employer can reasonably accommodate its employee. "This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."

29 C.F.R. § 1630.2(o)(3).  Both employer and employee are required to share relevant information in order to resolve the request in a swift and favorable way.

A well-executed, good-faith interactive process may involve the following employer actions: "meet[ing] with the employee who requests an accommodation, request[ing] information about the condition and what limitations the employee has, ask[ing] the employee what he or she specifically wants, show[ing] some sign of having considered [the] employee's request, and offer[ing] and discuss[ing] available alternatives when the request is too burdensome." *Taylor v. Phoenixville Sch. Dist.*, 174 F.3d 142, 162 *on reh'g*, 184 F.3d 296 (3d Cir. 1999).  "What matters under the ADA are not formalisms about the manner of the request, but whether the employee . . . provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation." *Id.* at 313.

When this interactive process fails, liability attaches to the party who caused the breakdown.  In determining responsibility for the failure of an interactive process, courts look to *good faith* and *reasonable efforts* in light of the complete set of circumstances to isolate the cause of a breakdown and assign liability.  *Beck v. Univ. of Wisconsin Bd. of Regents,* 75 F.3d 1130, 1135-36 (7th Cir. 1996).  "No hard and fast rule will suffice, because neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability."  *Id.*  "[W]hen presented with conflicting facts about the provenance of a breakdown," courts must deny motions for summary judgment.  *Goonan v. Fed. Reserve Bank of New York*, 916 F. Supp. 2d 470, 480 (S.D.N.Y. 2013), *reconsideration denied,* 12-CV-3859 (JPO), 2013 WL 1386933 (S.D.N.Y. Apr. 5, 2013); *accord Johns v. Laidlaw Educ. Servs.*, 199 F. App'x 568, 571 (7th Cir. 2006); *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005); *Bohen v. Potter*, 04-CV-1039S, 2009 WL 791356 (W.D.N.Y. Mar. 23, 2009); *Rowe v. City & Cnty. of San Francisco*, 186 F. Supp. 2d 1047, 1051 (N.D. Cal. 2002).

As an example of a possible "reasonable accommodation" under the ADA, Equal Employment Opportunity Commission ("EEOC") regulations mention "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position." 29 C.F.R. § 1630.2(*o*)(1)(ii). "[T]he determination of whether a particular modification is 'reasonable' involves a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it." *Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d Cir.1995) (citations omitted). "Ineffective modifications are . . . not accommodations." *E.E.O.C. v. UPS Supply Chain Solutions,* 620 F.3d 1103, 1110 (9th Cir.2010). But the Second Circuit has been clear that the ADA "does not require the employer to provide every accommodation the disabled employee may request, so long as the accommodation provided is reasonable." *Fink v. New York City Dep't of Pers.*, 53 F.3d 565, 567 (2d Cir. 1995). In its explanation of regulations issued pursuant to the ADA, the EEOC has likewise explained that "the employer providing the accommodation has the ultimate discretion to choose between effective accommodations." Equal Employment Opportunity for Individuals with Disabilities, 29 CFR Part 1630, 56 FR 35726-01, 35,749 (July 26, 1991).

### 2. Application of the Discrimination Standard

The Fed does not appear to dispute that (1) Goonan has a disability, (2) the Fed had notice of his disability, and (3) reasonable accommodations could have allowed Goonan to perform the essential functions of his job. Instead, the Fed contends that it offered Goonan reasonable accommodations that he refused, and that he unilaterally terminated the interactive process in a way that forecloses his claim under the ADA. Taking the facts in the light most

favorable to Goonan, the Court assumes that the first three elements are met and considers only the latter two arguments for summary judgment. As explained below, neither of those arguments succeeds in preventing this case from reaching a jury.

First, it is far from clear that the Fed's seven proposed modifications would have reasonably accommodated Goonan's disability. Neither of Goonan's treating doctors recommended or approved the changes, and at their depositions they indicated that such changes might be ineffective or even dangerous. Further, the changes simply do not address Goonan's consistently stated fear of being near the site of the WTC. The fact that such modifications may have worked for another employee under different circumstances does not show that they were suitable for Goonan as a matter of law, particularly in light of his doctors' statements. Discovery, then, has revealed little to disturb the view that the Fed offered Goonan "an inadequate parade of advanced light fixtures, soothing soundtracks, windowless desks, and micro-managed assignments." *Goonan*, 916 F. Supp. 2d at 484.

The Fed points out that Goonan rejected these modifications without trying them and it suggests that this is a ground for summary judgment. But the ADA imposes no obligation on an employee to try out proposed modifications to test their effectiveness: the interactive process does not extend so far as to require either party to do what the other wants on a trial basis. The far more efficient option—indeed, the one contemplated by the ADA—is for employee and employer to *exchange information in good faith* about what will or will not work before parties spend money and time on setting up accommodations.

Second, there is a genuine dispute as to whether a move to EROC was actually offered to Goonan. The parties agree that Sun-Jannes raised the question of a move to EROC as an accommodation in her April 19th voicemail. But Goonan contends this was in the context of a wider discussion about moving entire teams to EROC because of space constraints at 3 WFC. It

11

appears that no one really wanted to go and ultimately no application development teams were moved to EROC at all. Further, Goonan could not be moved on his own consistent with the Fed's stated rationale for denying his first transfer request—that is, a putative need for close supervision. If the Fed had clearly offered Goonan a transfer to EROC, this might be a different case. But because it is not clear that such an offer was made, the discussion of EROC cannot ground summary judgment. The Fed cannot prevail at the summary judgment stage by arguing that it undisputedly offered accommodations that were reasonable as a matter of law. Taken in the light most favorable to Goonan, the evidence in the record does not support such an inference.

The Fed's best remaining argument for summary judgment is that Goonan unilaterally terminated the interactive process by choosing to retire rather than continuing a discussion of alternative accommodations, and that this excuses any failure to offer reasonable accommodations. But the Fed's contention that Goonan unilaterally terminated the good-faith interactive process is thrown into doubt by the record. It appears undisputed that Goonan chose to retire after becoming frustrated with the Fed's persistent refusal to reasonably accommodate his disability, and, a week later on his last day in the office, Goonan refused Stagg's last-ditch attempt to keep talking about possible accommodations. But an ADA interactive process is not governed by any brittle last-shot rule. The heart of the interactive process in an accommodations case is an exchange of information and proposed accommodations in a good-faith and timely manner. When a breakdown occurs and courts are called on to determine who is responsible:

> [C]ourts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the

> breakdown and then assign responsibility . . . . The determination must be made in light of the circumstances surrounding a given case.

*Beck*, 75 F.3d at 1135-36.  Goonan's mere decision to quit, then, cannot be dispositive of the entire interactive-process question.  The Court looks instead to reasonable efforts and good faith in light of all the circumstances.  *But see Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731 (5th Cir. 1999) (affirming a district court's grant of summary judgment for defendant-employer where plaintiff quit rather than allowing interactive process to continue); *Gingold v. Bon Secours Charity Health Sys.*, 768 F. Supp. 2d 537, 546 (S.D.N.Y. 2011) (holding that employer's obligations to disabled employee terminated with delivery of resignation notice.)

In this case, Goonan made his needs known to Fed management at several levels. And Fed management repeatedly denied his requests for accommodation because of Goonan's declining performance—an explanation that, as this Court has said, turns the rationale of the reasonable accommodation rule on its head and calls into question the good faith of the employer.  *Goonan*, 916 F. Supp. 2d at 483.  And even though the Fed explained to Goonan that poor performers could not telecommute, other employees who were below standards telecommuted full-time.  Further, the Fed added that it could not move Goonan back to the Main Building because of cost and space issues—and then moved other developers to exactly those offices shortly after he retired.  It could be that these facts are consistent with good faith.  But this argument will not protect the Fed from the scrutiny of a trial for two reasons.  First, the interactive process of the ADA demands active participation by both parties in creating a reasonable accommodation, not just occasional employer reactions as a mentally ill[3] employee

---

[3] "In a case involving an employee with mental illness, the communication process becomes more difficult." *Bultemeyer v. Fort Wayne Cmty. Sch.*, 100 F.3d 1281, 1285 (7th Cir. 1996). Even if it were more clear that Goonan had terminated the interactive process, evidence on the record indicates that this may have been because he was suffering acutely from a mental illness

works his way through the resources structure.  Second, a jury could also conclude on the basis of these facts that the Fed was merely attempting to placate Goonan rather than making good-faith reasonable efforts to accommodate him.  Here, then, the Fed's rejection of Goonan's request, the dubious coherence of its proffered explanations for that decision, and its unwillingness to show any flexibility despite Goonan's repeated efforts to seek out doctors, supervisors, and ombudsmen all create genuine questions as to the Fed's good faith and the reasonableness of its efforts to help Goonan.

Further, Fed management told Goonan directly that it was "not going to change its mind" about his request for an accommodation.  (Taub 95:10-96:4)  "When a breakdown occurs because an employer creates an objectively reasonable perception that the process is clearly at an end, the employer is as well placed as the employee to avoid the situation.  It knows what it said, and how a reasonable person would interpret it, and thus bears responsibility for salvaging the

---

that impaired his capacity to keep asking for help—and not because he was acting in bad faith or failing to make reasonable efforts. *See id.* (holding that "[t]he employer has to meet the employee halfway, and if it appears that the employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help."); *accord Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 109 (1st Cir. 2005); *Criado v. IBM Corp.*, 145 F.3d 437, 444 (1st Cir. 1998).  In the context of a mentally ill employee requesting reasonable accommodations, the Third Circuit has said that "[o]nce the employer knows of the disability and the employee's desire for accommodations, *it makes sense to place the burden on the employer* to request additional information that the employer believes it needs.  Disabled employees, especially those with psychiatric disabilities, may have good reasons for not wanting to reveal unnecessarily every detail of their medical records because much of the information may be irrelevant to identifying and justifying accommodations, could be embarrassing, and might actually exacerbate workplace prejudice.  An employer does not need to know the intimate details of a bipolar employee's marital life, for example, in order to identify or justify an accommodation such as a temporary transfer to a less demanding position." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 315 (3d Cir. 1999) (emphasis added).  Other courts may very well agree, but it is unnecessary to address further the nuances of mental illness in the interactive process to resolve this motion.  Even if Goonan's disability had been purely physical, summary judgment would be inappropriate.

process." *Loulseged*, 178 F.3d at 739.  Even absent the other evidence that raises a genuine issue as to who shut down the interactive process, a reasonable jury could conclude from this that the Fed's statements created an objectively reasonable perception that the interactive process was over and that Goonan had to choose between inadequate accommodations and ending his career.

The Fed has not made arguments materially different from those that this Court rejected in its opinion on the Fed's motion to dismiss, and discovery has revealed no new grounds that warrant summary judgment.  Consequently, the Fed's motion for summary judgment as to Goonan's ADA discrimination claim is denied.

### 3. Undue Hardship

The Fed argues in its motion for summary judgment that Goonan's proposed accommodations were legally unreasonable because they would have imposed an undue hardship on the Fed.  "'Undue hardship' is an employer's affirmative defense, proof of which requires a detailed showing that the proposed accommodation would require significant difficulty or expense in light of specific enumerated statutory factors." *Rodal*, 369 F.3d at 121-22 (internal quotation marks and modifications omitted).  These enumerated factors are (1) the employer's type of operation, including its composition, structure, and the functions of its workforce; (2) the employer's overall financial resources; (3) the financial resources involved in the provision of the reasonable accommodation; and (4) the impact of such accommodation upon the employer's operation.  *See* 42 U.S.C. § 12111(10)(A)-(B).

In his opposition to the Fed's motion for summary judgment, Goonan argues that *he* is entitled to partial summary judgment on the Fed's affirmative defense of undue hardship because, among other things, the Fed has failed completely to make the requisite "detailed showing" that moving him to the Main Building or allowing him to telecommute would have imposed an undue hardship.  *Rodal*, 369 F.3d at 121.  Because motions for summary judgment

15

search the entire record, courts may order summary judgment for the non-moving party if there is undisputed support for their position. *See New England Health Care Employees Union, Dist. 1199, SEIU AFL-CIO v. Mount Sinai Hosp.*, 65 F.3d 1024, 1030 (2d Cir. 1995).

Viewing the facts in the light most favorable to the Fed, partial summary judgment as to undue hardship is not appropriate here because the parties disagree about the "structure and function" of the Fed's workforce, including the level of face-to-face interpersonal interaction and supervision required for Goonan to do his job. These are not bare allegations of factual dispute: the Fed can point to Goonan's low communication and self-management ratings and the complications involved in either moving Sun Jannes and her entire team away from 3 WFC or supervising Goonan from a distance. For these reasons, partial summary judgment as to the undue burden defense is denied.

## C. Retaliation under the ADA

### 1. Legal Standard for Retaliation

The ADA prohibits retaliation against those who assert their rights under it. *See* 42 U.S.C. § 12203(a) ("No person shall discriminate against any individual because such individual . . . made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.") To make a claim of retaliation under the ADA, a plaintiff must show that "(1) [plaintiff] engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against [plaintiff][,] and (4) a causal connection exists between the alleged adverse action and the protected activity." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir. 2002). The standard is "phrase[d] in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006). To engage in a "protect activity" is to take action "to protest or

16

oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000). "Adverse employment action" is defined "broadly" and includes "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001) (quoting *Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir. 1999)). Unlike discrimination, however, to make out a retaliation claim, plaintiff must provide "competent evidence of circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive." *Smiley v. Cassano,* No. 10 Civ. 3866, 2012 WL 967436, at *4 (S.D.N.Y. Mar. 21, 2012) (citations omitted).

### 2. Application of the Retaliation Standard

"It is well established that requesting an accommodation . . . [is] behavior protected from an employer's retaliation." *Carreras v. Sajo, Garcia & Partners,* 596 F.3d 25, 35–36 (1st Cir. 2010) (internal quotation marks omitted); *accord Weixel v. Board of Educ. of City of New York,* 287 F.3d 138, 149 (2d Cir. 2002). Goonan argues that the Fed retaliated against him for his accommodation request by holding him to a different and higher standard for telecommuting than was applied to other, non-disabled employees. The Fed argues now, as it did at the motion to dismiss stage, that it had no retaliatory motive and denied Goonan's request because of his declining performance.

Discovery has borne out a genuine dispute as to retaliatory treatment. The record shows that other employees with comparable or worse performance were indeed allowed to telecommute, and a jury could reasonably find that Goonan was treated differently because he asked for accommodation on the basis of a disability. For these reasons, the Fed's motion for summary judgment is denied as to Goonan's retaliation claim.

D.  **State and City Law Claims**

The NYSHRL and NYCHRL impose liability standards that substantially track those of the ADA. The NYCHRL is even more generous to plaintiffs at this stage because it presumes that an accommodation is reasonable if it "*can* be made" and "shall not cause undue hardship in the conduct of the [employer's] business. The [employer] shall have the burden of proving undue hardship." N.Y.C. Admin. Code § 8-102(18). Because there is no difference between the New York standards and the ADA that would justify summary judgment on those claims alone, the NYSHRL and City Law claims survive as well.

III.  **Conclusion**

For the foregoing reasons, the Fed's motion for summary judgment is denied. The Clerk of Court is directed to close the motion at Docket Number 60.


SO ORDERED.


Dated: July 22, 2014
       New York, New York


_____
                    J. PAUL OETKEN
                United States District Judge